# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE ESTATE OF RAPHAEL COSTOBILE-FULGINITI | : : : | CIVIL ACTION |
| v. | : : | |
| CITY OF PHILADELPHIA, et al | : | NO. 08-1752 |

## MEMORANDUM OPINION

**Goldberg, J.**  June 15, 2010

This case, involving the tragic death of a two-month old infant, comes before the Court on the City of Philadelphia's ("the City") motion for summary judgment. The primary issue before the Court is whether the City is liable, pursuant to 42 U.S.C. § 1983, for releasing the infant to the mother's home despite the fact that the infant tested positive for methadone at birth and where the City was aware of several subsequent reports regarding inadequate care. As the City did not owe a general duty to the infant to protect him from harm and because the City did not have a special relationship with the infant or create the danger that led to his death, we will grant Defendant's motion.

## I. FACTUAL BACKGROUND

The deceased, Raphael Costobile-Fulginiti, was born on December 12, 2005. The next day, the City of Philadelphia Department of Human Services ("DHS") received a report that Raphael had tested positive for methadone.[1] Deborah Council, the DHS social worker who received the report, advised the hospital that Raphael was not to be released until she had conducted a home evaluation.

---

[1] Over the course of Raphael's life, DHS received several "reports" of suspected neglect or abuse regarding Raphael. Under 23 Pa. C.S. § 6340(c), the release of information that would reveal the identity of a reporter is prohibited, thus we will refer to the "reports" generically.

1

Thereafter, Council visited the residence of Christina Costobile, Raphael's mother. During this visit, on December 14, 2005, Costobile admitted to using methadone during her pregnancy and heroin in 2004. At Council's urging, Costobile attempted to make an appointment for a substance abuse treatment evaluation. Council also observed that the residence was neat, with working utilities, and equipped with a bassinette, baby clothes, diaper wipes, formula and other baby items. Costobile also advised Council that Raphael had an appointment with a pediatrician on December 16, 2005. After this visit, DHS contacted the hospital and cleared Raphael for discharge.[2] (Statements of Undisputed Facts, ¶¶1-3, 8-19; Defendant's Mot., Ex. 4; Plaintiff's Resp., Exs. A, C, G).

DHS received a subsequent report regarding Raphael on January 11, 2006. The reporter claimed that Costobile worked nights, leaving Raphael at his aunt's home where drug dealing occurred. The report also claimed that Raphael had a severe rash that Costobile had delayed treating. On January 12, 2006, Council made an unannounced visit to Costobile's residence. There, Council observed no evidence of drug use by Costobile; that Raphael's rash was being treated; that the residence was clean and properly equipped; and that Raphael was of an appropriate weight and hygiene. On February 3, 2006, Council visited Raphael's aunt's home, and found no evidence of drug dealing. She also noted a bassinette, baby supplies and a relatively neat home. (Statements of Undisputed Facts, ¶¶ 20-27).

On February 23, 2006, Council received a report that Costobile had not obtained health insurance for Raphael, and that she was using drugs. The reporter also claimed that Raphael had been taken to a pool hall, and was suffering from cellulitis. Council spoke with Costobile on

---

[2]According to DHS policy, the social worker assigned to a case must complete a report and determine whether allegations are substantiated or unsubstantiated within sixty (60) days. Council failed to complete this report within sixty days.

February 24, 2006, and learned that Raphael had been admitted to the hospital over Christmas and released shortly thereafter. Council further learned that while Raphael still did not have health insurance, Costobile had scheduled an appointment with Raphael's pediatrician. Costobile again denied any substance abuse, but admitted missing her substance abuse evaluation due to weather. Also on February 24, 2006, Raphael's paternal grandmother requested documentation from DHS that would allow her to file for emergency custody of Raphael. Council advised the grandmother that DHS had not discovered enough evidence to seek Raphael's removal. (Statements of Undisputed Facts, ¶¶ 30-38).

The same day, while Costobile and Raphael were sleeping together, Raphael stopped breathing and died. Costobile reported waking up to discover that Raphael was not breathing and was turning blue. According to the DHS investigation summary of Raphael's death, a reporter had warned DHS that, "[m]other is always high and sleeps in the bed with [Raphael]." (Statements of Undisputed Facts, ¶ 39; Plaintiff's Resp., Ex. U).

On April 3, 2008, Plaintiff, the estate of Raphael Costobile-Fulginiti, filed a complaint in the Philadelphia County Court of Common Pleas against the City of Philadelphia, DHS, the Pennsylvania Department of Public Welfare, and the Commonwealth of Pennsylvania. The complaint raised the following claims: Wrongful Death against all defendants (Count I); Survival action against all defendants (Count II); Civil Rights claim under 42 U.S.C. § 1983 against all defendants (Count III); and a "Direct Claim Under 1st, 5th and 14th Amendments to the U.S. Constitution" against all defendants (Count IV). On April 14, 2008, the case was removed to this Court, and subsequently, Plaintiff's claims against the Pennsylvania Department of Public Welfare and the Commonwealth of Pennsylvania were voluntarily dismissed. On July 20, 2009, the City of

3

Philadelphia filed the instant motion for summary judgment.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Brooks v. CBS Radio, Inc., 342 Fed.Appx. 771, 775 (3d Cir. 2009) (citing Fed. R. Civ. P. 56(c)). "In determining whether the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the facts must be viewed, and all reasonable inferences must be drawn, in the light most favorable to the non-moving party." Id. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). The Court's function in deciding a motion for summary judgment is not to decide disputed questions of fact, but only to determine whether genuine issues of fact exist. Id. at 248-249.

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non[-]moving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

### B. Claims Against DHS (Counts I-IV)

At the outset, all claims raised against DHS will be dismissed. "DHS [does not have] an independent corporate existence from the City of Philadelphia; therefore, all claims against them must be brought in the name of the City." Burton v. City of Philadelphia, 121 F.Supp.2d 810, 812 (E.D. Pa. 2000) (citing 53 P.S. § 16257).

### C. State Law Claims (Counts I-II)

Plaintiff has also raised state law claims against the City of Philadelphia under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301, (Count I) and the Pennsylvania Survival Act, 42 Pa. C.S. § 8302, (Count II). Both of these claims sound in tort and are governed by the Political Subdivision Tort Claims Act, 42 Pa. C.S. § 8501 et seq ("Tort Claims Act"). Richardson v. City of Philadelphia, 1992 WL 46899, at *10 (E.D. Pa. Mar. 6, 1992). This Act provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or any employee thereof or any other person." 42 Pa. C.S. § 8541. The City is such a local agency. Weinerman v. City of Philadelphia, 785 F.Supp. 1174, 1178 (E.D. Pa. 1992). The exceptions to this immunity provision are not applicable here. See 42 Pa. C.S. § 8542(b). Because the City cannot be liable to Plaintiff under state law, Counts I and II shall be dismissed. See Richardson, 1992 WL 46899, at *11 (dismissing a plaintiff's wrongful death and survival claims against the City of Philadelphia pursuant to the Tort Claims Act).

### D. Federal Claims (Counts III-IV)[3]

Plaintiff argues that their federal claims should proceed to trial for two reasons. First, Plaintiff argues that they have produced sufficient evidence that the City violated Raphael's constitutional rights by failing to protect him from the harm caused by his mother. Additionally, Plaintiff asserts that DHS employees altered and falsified documents relevant to this case, and thus Plaintiff is entitled to a spoliation sanction. We address each of these arguments below.

#### 1. Plaintiff's § 1983 Claims

The Supreme Court set forth the general rule regarding a State's duty to protect citizens from harm by private actors in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), where the Court held that:

> . . . nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, and property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

Id. at 195. The Court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197. Here, Plaintiff alleges that the City had a duty to protect Raphael from his mother. Under the general rule of DeShaney, such claims would fail because "no affirmative duty to protect arises from the State's

---

[3] Count III, "Civil Rights Claim - 42 U.S.C. § 1983" and Count IV, "Direct Claim under 1st, 5th, and 14th Amendments to the U.S. Constitution" raise the same allegations. Section 1983 does not itself establish any particular federally protected right but instead acts as a vehicle through which an injured person may raise a claim against an individual who, acting under color of state law, violated the rights afforded to that injured person by the Constitution or a federal statute. 42 U.S.C. § 1983. Therefore, § 1983, which is cited in Count III, is simply the vehicle for Plaintiff to raise his claims that the City violated his First, Fifth and Fourteenth Amendments, which are listed as a separate claim in Count IV.

6

knowledge of the individual's predicament." Bennett v. City of Philadelphia, 499 F.3d 281, 288 (3d Cir. 2007) (citing Bright v. Westmoreland County, 443 F.3d 276, 284 (3d Cir. 2006). However, Plaintiff cites exceptions to this general rule, which we address as follows.

The first exception applies "[w]here a duty arises out of a 'special relationship' created or assumed by the State with regard to a certain individual." Moore v. Weisberg, 2007 WL 4322988, at *3 (E.D. Pa. Dec. 10, 2007). Under these circumstances, "the State acquires an affirmative duty to protect that individual from harm." Id. The Third Circuit has generally held that this is a very limited exception that requires a custodial relationship. Stanford v. Stiles, 456 F.3d 298, 304 n.4 (3d Cir. 2006); Nicini v. Morra, 212 F.3d 798, 808 (3d. Cir. 2000) (holding that foster children have a special relationship with the State because the State takes legal custody).

Plaintiff points out that pursuant to DHS instructions, Raphael was held at the hospital after his birth for up to 40 hours before being released. Thus, according to Plaintiff, DHS became Raphael's legal custodian during this time period, creating a special relationship. We note however, that there was no court order transferring custody of Raphael to DHS, and where the State takes only temporary custody of a child, no special relationship exists. DeShaney, 489 U.S. at 201 (holding that there was no special relationship where a child was held in the hospital for three days by a court order requested by the Department of Social Services after the child was admitted to the hospital because of injuries indicative of abuse). Thus, the special relationship exception does not apply.

The second exception is referred to as the "state-created danger" exception. "[T]o establish a claim based on the state-created danger doctrine, a plaintiff must satisfy the following elements: (1) the harm caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) some relationship existed between the state and the

7

plaintiff that renders plaintiff a foreseeable victim; and (4) 'a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.'" Bennett, 499 F.3d at 287 (citing Bright, 443 F.3d at 281). "Liability requires affirmative state action; mere 'failure to protect an individual against private violence' does not violate the Due Process Clause." Bright, 443 F.3d at 284 (citing DeShaney, 489 U.S. at 197).

Plaintiff argues that the City is liable under the state created danger exception, because DHS affirmatively acted in releasing Raphael to his mother's home in spite of the danger. DeShaney, and Third Circuit precedent, does not support this position.

In DeShaney, in January of 1982, the Winnebago County Department of Social Services ("DSS") became aware that Joshua DeShaney might be a victim of abuse. DSS interviewed the father with whom Joshua was living, and thereafter did not further pursue the allegations. In January 1983, Joshua was admitted to the hospital wherein the examining doctor notified DSS of possible abuse. Through court order, DSS placed Joshua in the temporary custody of the hospital. Three days later, DSS concluded that there was insufficient evidence of abuse to keep Joshua in the hospital's custody, and he was returned to his father. About a month later, emergency room personnel called DSS and reported suspicious injuries. The DSS caseworker recorded the incident, but took no action. In November of 1983, DSS was again notified by emergency room personnel about suspicious injuries, but DSS took no action despite being told that Joshua was too ill to see the caseworker on their next two visits. In March of 1984, Joshua's father beat him, causing him to fall into a coma. DeShaney, 489 U.S. at 192-93.

Despite these facts, the Supreme Court held that DSS was not liable for Joshua's injuries.

After stressing that a state's failure to protect an individual against private violence is not actionable, the Court stated that "[DSS] placed [Joshua] in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered them shelter." Id. at 201.

Here, we likewise find that releasing Raphael into his mother's home did not create the danger. DHS did not place Raphael in a worse position than that in which he would have been had it had not stepped in at all. Additionally, the temporary delay of Raphael's release to his mother's home, did not make DHS permanent guarantor's of Raphael's safety. We, therefore, find that the state created danger exception does not apply.

The Bennett case supports this conclusion. In Bennett, three sisters and the estate of one deceased sister brought § 1983 claims against the City of Philadelphia, where a family court had previously ordered DHS supervision of the sisters because their mother was a substance abuser who posed a risk of serious harm and where one sister had previously been placed in temporary foster care. Bennett, 499 F.3d at 283-284. The removed sister was later returned to the mother, and DHS subsequently discharged supervision. Id. Approximately three years later, DHS was notified that the sisters were exposed to unsuitable living conditions and an unfit care giver who beat the children, however DHS failed to respond. The youngest sister was then beaten to death. Id. at 284-285.

The District Court granted the City's motions for summary judgment, and the Third Circuit affirmed. Although the Third Circuit found that the DHS workers inactions were "beyond the pale," summary judgment was found to be properly granted, because plaintiff had failed to produce evidence "that the City used its authority to create an opportunity for the [victims] to be abused that would not have existed absent DHS intervention." Id. at 289.

Similarly, here, we find that there is insufficient evidence to submit to a fact-finder to establish that the City used its authority to create an opportunity for Raphael to be abused. Plaintiff's main contention is that DHS committed an affirmative act by authorizing the release of Raphael from the hospital. This is simply not enough to withstand the granting of Defendant's motion. Put another way, there are no affirmative facts of record to establish that "but for" the acts of DHS, the death would not have occurred. Kaucher v. County of Bucks, 455 F.3d 418, 433 (3d Cir. 2006) (plaintiff's must allege affirmative acts that were the "but for cause" of the risks they faced).

In an attempt to avoid dismissal, Plaintiff cites to Tazioly v. City of Philadelphia, 1998 WL 633747 (E.D. Pa. Sept. 10, 1998), where the court held the City liable under the state created danger exception. Tazioly, however, is factually distinguishable from the case before the Court.

In Tazioly, a child was born addicted to cocaine. Id. at *3. Once the child was cleared for release from the hospital, he was discharged to his godmother, who was subsequently granted legal custody. Thereafter, the child resided with the godmother for two years, during which time the child's mother failed to make suitable housing arrangements, failed to make progress with drug treatment, and displayed "bizarre and hostile" behavior. Id. at *3-*4. DHS, nonetheless, recommended the termination of the godmother's custody and the family court granted custody to the mother. After the transfer of custody, the child was severely beaten by his mother. Id. at *5. The Court denied DHS's motion for summary judgment, finding that DHS made the child more vulnerable to mother's violence. Id. at *12.

The Tazioly Court distinguished its facts from DeShaney on two grounds. First, the Court noted that, "[u]nlike Joshua DeShaney, who was in the *temporary* custody of the hospital for only several days, [the child in this case] had been in [his godmother's] custody for almost two years."

Id. (emphasis in original). Second, the Court noted that in DeShaney, custody was granted to father after "a pediatrician, psychologist, police detective, lawyer, social service caseworkers, and various hospital personnel collectively concluded that 'there was insufficient evidence of child abuse to retain Joshua in the custody of the court.'" Id. (quoting DeShaney, 489 U.S. at 192). Conversely, in Tazioly, DHS recommended that the mother have custody with "actual knowledge that she was unfit and dangerous." Id.

The case before us more closely resembles the facts of DeShaney because the hospital detained Raphael for only approximately 40 hours pursuant to DHS instructions and because DHS authorized the release of custody after conducting a home investigation and without actual knowledge that Costobile was "unfit and dangerous." Thus, we conclude that the City had not rendered Raphael more vulnerable to injury and, therefore, cannot be liable for Raphael's death.[4]

### 2. Plaintiff's Spoliation Claims

In both its response and at oral argument on Defendant's motion, Plaintiff asserted that Council and her supervisor, Michael Meketon, altered, falsified and destroyed DHS records. According to Plaintiff, this alleged "spoliation" entitles them to a sanction amounting to either denial of the motion for summary judgment or judgment in their favor. We find, however, that Plaintiff has mischaracterized the facts related to this issue and that a spoliation sanction is not appropriate.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Paramount

---

[4] The fact that Council's initial report was not completed within the sixty day period has no bearing on the City's liability because it did not put Raphael in a worse position than he was already in. See Bennett, 499 F.3d at 285 (where the City's motion for summary judgment was granted even though the DHS worker failed to make reasonable efforts to visit the victim's home, made false and misleading representations regarding a hotline report, and failed to make a home visit within the required period of time).

Pictures Corp. v. Davis, 234 F.R.D. 102, 110 (E.D. Pa. 2005). Establishing spoliation may give rise to a variety of sanctions: "(1) dismissal of a claim or granting judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference, referred to as the spoliation inference; (4) fines; and (5) attorneys' fees and costs." Id. at 110-111. There is no rule mandating a particular sanction and it is left up to the court's discretion. Id. at 111. In exercising this discretion, a court should consider: (1) the degree of fault of the party who altered or destroyed evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether a lesser sanction will avoid substantial unfairness to the opposing party but will deter this conduct. Id.

Plaintiff chiefly complains that Council's original investigation notes, as well as other documents from Raphael's file, have been destroyed. According to her deposition, Council took handwritten notes during her investigation. At the completion of the investigation, Council typed her notes into a computer and placed the typed notes into the file. Council then threw away her original handwritten notes. She testified that all of the information from her handwritten notes would be included in the typed forms. (Council Dep., pp. 50-51).

Council's supervisor, Michael Meketon, testified that it was common practice at DHS for a social worker to discard original documents and notes after the information had been copied or typed up and placed in the file. Meketon likened the original documents to rough or working drafts. (Meketon Dep., pp. 156-157). We find that this practice, and Council's conduct in following this practice, does not warrant spoliation sanctions. Plaintiff has not provided any evidence that Council's original handwritten notes or original documents were purposely altered or omitted when

transferred from rough draft to final draft form.[5]

Plaintiff also complains about "backdated" documents, referencing documents with dates handwritten on them after the documents had been printed. For example, on a form printed on May 11, 2006, a determination date of "3/14/06," is handwritten on the form. (Plaintiff's Resp., Ex. L). Like the discarded handwritten notes discussed above, Meketon explained that Council recreated these documents and then handwrote the date from the rough drafts. (Meketon Dep., pp. 149-154). Plaintiff has not provided any evidence that this date was not the actual determination date. As such, a spoliation sanction is not appropriate.

### III. CONCLUSION

Plaintiff has failed to present any evidence that Raphael was placed in a more dangerous position because of an affirmative act by DHS. According to the record, the conduct of Raphael's mother was the sole source of danger in Raphael's life, and there are simply not enough facts for a jury to consider as to whether DHS's conduct or failure to act during the course of its investigation increased that risk. The alleged spoliation issues raised by Plaintiff does not alter this conlcusion.

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. Our Order follows.

---

[5] We have considered the fact that a document entitled "Hotline Screening Factors" form for the December 13, 2005 report, was apparently missing from Raphael's file. This form would indicate the risk factors originally mentioned by the reporter, including Raphael's testing positive for methadone. Nonetheless, there is nothing in the record indicating that the omission of this document was intentional. Council testified that a copy of this document should have been included in the file despite the original having been discarded. (Council Dep., pp. 43-44). Meketon further indicated that the information contained in this form would not be substantially different than other risk factor information available elsewhere in the file. (Meketon Dep., p. 178).